1    (All counsel listed on signature page)

2

3

4

5

6

7

8

9                          UNITED STATES DISTRICT COURT

10                     FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                                SAN JOSE DIVISION

12   GOOD TECHNOLOGY CORPORATION              Civil Action No. C-12-05826 PSG
     AND GOOD TECHNOLOGY SOFTWARE,
13   INC.                                     **PLAINTIFF GOOD TECHNOLOGY
                                              CORPORATION AND GOOD
14              Plaintiff,                     TECHNOLOGY SOFTWARE, INC.'S
                                              OPENING CLAIM CONSTRUCTION
15        v.                                  BRIEF**

16   MOBILEIRON, INC.,

17              Defendant.                    **[PATENT LOCAL RULE 4-5(a)]**

18

19   GOOD TECHNOLOGY CORPORATION              Civil Action No. C-12-05827 PSG
     AND GOOD TECHNOLOGY SOFTWARE,
20   INC.

21              Plaintiff,

22        v.

23   AIRWATCH LLC,

24              Defendant.

25

26

27

28

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

**TABLE OF CONTENTS**

I.     TECHNOLOGY OVERVIEW ................................................................................ 1

II.    PRINCIPLES OF CLAIM CONSTRUCTION ..................................................... 2

III.   DISPUTED CLAIM CONSTRUCTIONS ............................................................ 3

     A.    '606 PATENT ........................................................................................... 3

         1.      "untrusted client site" ['606: 1, 10, 21, 25] .................................... 4

         2.      "temporary storage" ['606: 1, 10, 21, 25] ................................... 6

         3.      "synchronizing the manipulated data with the data at the remote site" / "synchronize the data" / "synchronizing the manipulated workspace data with the generated workspace data of the second client site via the remote site" ['606: 1, 10, 21, 25] ........................................................................................... 8

     B.    '219 PATENT ........................................................................................... 9

         1.      "a data tracker configured to track a location of data items held on the client device, the data tracker tracking a correspondence of the data items to the first set or the second set" ['219: 18] ........................................................................ 9

         2.      "list identifying each data item as belonging to one of the first set and the second set" ['219: 1, 9, 10] ....................................... 11

     C.    '386 PATENT ......................................................................................... 12

         1.      "set of rules" ['386: 1, 16, 17] ..................................................... 12

         2.      "rules engine" ['386: 1, 16] .......................................................... 13

         3.      "the service" ['386: 16] ................................................................. 15

     D.    '322 PATENT ......................................................................................... 17

         1.      "rules uniquely identifying the updates for the wireless device" ['322: 1, 12] .................................................................. 17

         2.      "message indicating one or more files within the updates to [download/upload]" ['322: 1, 7, 12] ....................................... 18

         3.      "searching a compatibility matrix [to identify/for] rules associated with each update" ['322: 1, 7, 12] ............................ 20

         4.      "web-based software server" ['322: 1, 2, 7, 12, 13, 16] ............... 21

IV.   CONCLUSION ................................................................................................ 23

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

i

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

C<small>ASES</small>

4

*Acer, Inc. v. Tech. Props., Ltd.*,
    2009 U.S. Dist. LEXIS 8001 (N.D. Cal. Feb. 4, 2009) ....................................... 8

5

*Ancora Tech. v. Apple Inc.*,
    744 F.3d 732 (Fed. Cir. 2014) ....................................................................... 6

6

7

*ArcelorMittal Fr. v. AK Steel Corp.*,
    700 F.3d 1314 (Fed. Cir. 2012) ..................................................................... 14

8

*CBT Flint Partners, LLC v. Return Path, Inc.*,
    654 F. 3d 1353 (Fed. Cir. 2011) .................................................................... 16

9

10

*Greenberg v. Ethicon Endo-Surgery*,
    91 F.3d 1580 (Fed. Cir. 1996) ...................................................................... 10

11

12

*Inventio Ag v. Thyssenkrupp Elevator Americas*,
    649 F.3d (Fed. Cir. 2011) ............................................................................ 10

13

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
    382 F.3d 1354 (Fed. Cir. 2004) ..................................................................... 10

14

15

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ...................................................................................... 8

16

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120, 2014 U.S. LEXIS 3818 (2014) ............................................ 16

17

18

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ............................................................14, 19, 20

19

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ......................................... 2, 7, 20, 22

20

21

*SanDisk Corp. v. Memorex Prods., Inc.*,
    415 F.3d 1278 (Fed. Cir. 2005) ..................................................................... 14

22

*Sealant Sys. Int'l, Inc. v. Tek Global S.R.L.*,
    2012 U.S. Dist. LEXIS 123313 (N.D. Cal. Aug. 29, 2012) ............................. 15

23

24

*Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*,
    743 F.3d 1359, 1366 (Fed. Cir. 2014) ........................................................... 16

25

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ..................................................................... 8

26

27

*Trading Techs. v.Espeed*,
    595 F.3d 1340 (Fed. Cir. 2010) ...............................................................passim

28

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ............................................................................passim

*Ultimax Cement Manufacturing Corp. v. CTS Cement Manufacturing Corp.*,
    587 F.3d 1339 (Fed. Cir. 2009) ...................................................................................16

*Verizon Cal. Inc. v. Ronald A. Katz Tech. Licensing, L.P.*,
    326 F. Supp. 2d 1060 (C.D. Cal. 2003) .........................................................................8

**STATUTES**

35 U.S.C. § 112 ..................................................................................................................10

**OTHER AUTHORITIES**

Local Rule 4-3(c) ..................................................................................................................3

Local Rule 4-5(a) ..................................................................................................................1

Merriam-Webster's Collegiate Dictionary ..........................................................................11

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case No. CV-12-05826/05827 (PSG)                                    GOOD'S OPENING CLAIM CONSTRUCTION BRIEF

Plaintiffs Good Technology Corporation and Good Technology Software, Inc., ("Good") respectfully submit their Opening Claim Construction Brief pursuant to Patent Local Rule 4-5(a) and this Court's Orders dated April 2, 2014 and May 28, 2014.

## I.    TECHNOLOGY OVERVIEW

The present actions both involve the same Good patents—namely U.S. Patent Nos. 6,151,606 (the "'606 Patent") (Ex. 1), 8,012,219 (the "'219 Patent") (Ex. 2), 7,970,386 (the "'386 Patent") (Ex. 3), and 7,702,322 (the "'322 Patent") (Ex. 4) (collectively, the "patents-in-suit").[1]   At issue in this case is the technology that enables remote and secure use of business information and business applications on a mobile device.

Good's '606 Patent is directed to the concept of disabling access to data on a mobile device after the user has finished using the data.  *See e.g.*, '606 Pat. at 3:6-9, 9:64-10:3, 10:34-39.  This is a useful security feature when a mobile device is lost or misplaced and at risk of use by unauthorized persons.  This feature, commonly known by different names—*e.g.*, "secure container," "remote wipe," "enterprise wipe," and "selective wipe"—has been imitated by Good's competitors, including Defendants.

Good's '219 Patent relates to a technical area that is similar to the '606 Patent.  In one embodiment, a server system can be used to prevent access to data stored on a mobile device.  '219 Pat. at 2:54-3:18, 7:35-51, 8:38-52.  Prevention can include encrypting or deleting the data, and can be done on a subset of the data on the device such that access to some data is maintained.  *Id.* at 7:35-51, 21:21-32.

Good's '386 Patent is directed to solving the problem of providing remote monitoring and maintenance of wireless devices—such as smartphones or tablets—that have access to data, including corporate email, instant messages, and calendar data, by way of a service application on

---

[1] The 32 claims at issue for claim construction in both cases are: Claims 1, 10, 21, 25, and 45 of the '606 Patent; Claims 1, 9, 10, 11, 14, 15, 16, 18, 19, 23, and 24 of the '219 Patent; Claims 1, 8, 9, 16, 17, 23, 24 of the '386 Patent; and Claims 1, 2, 5, 7, 12, 13, 14, 16, 18 of the '322 Patent (collectively "Good's Asserted Claims").  The language of these 32 claims at issue for claim construction can be found in Exhibit 5.

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA  94065

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

1  the wireless device. '386 Pat. at 1:44-50. To solve this problem, the '386 patent teaches a rules

2  engine on a wireless device that can receive a set of rules from a server and execute the set of rules

3  so as to monitor and take action on the wireless device based on policies. '386 Pat. at 4:29-67, 5:22-

4  67. This allows companies to monitor and maintain wireless devices having access to corporate data

5  based on company instituted policies that may be transmitted to wireless devices for

6  implementation. '386 Pat. at 5:22-32.

7  Good's '322 Patent relates to the distribution of software updates for wireless devices. The

8  software policies on a customer site define rules to identify updates for a wireless device, and the

9  device may communicate, via the web, with a software server regarding the updates. *See* '322 Pat.

10  at 3:3-34. In one embodiment, the web-based software server searches a compatibility matrix with

11  rules indicating whether an update is compatible with the wireless device. *Id.* at 3:53-59; 4:23-35.

## II.  PRINCIPLES OF CLAIM CONSTRUCTION

13  A "'bedrock principle of patent law [is] that 'the claims of a patent define the invention to

14  which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

15  (Fed. Cir. 2005) (en banc). The words in "a claim 'are generally given their ordinary and customary

16  meaning,'" which "is the meaning that the term would have to a person of ordinary skill in the art in

17  question at the time of the invention." *Id.* at 1312-13. Where claim construction is needed, courts

18  look to "'those sources available to the public that show what a person of skill in the art would have

19  understood disputed claim language to mean,'" including the intrinsic evidence of record consisting

20  of "'the words of the claims themselves, the remainder of the specification, the prosecution history'"

21  and the "'extrinsic evidence concerning relevant scientific principles, the meaning of technical

22  terms, and the state of the art.'" *Id.* at 1314 (citations omitted).[2]

23  As the Federal Circuit has "repeatedly warned," courts must avoid confining claims to

24  specific embodiments and "avoid the danger of reading limitations from the specification into the

[2] Good proposes that a person of ordinary skill in the art would be a person in or around the time of the filings of the patents-in-suit with a bachelor's degree in computer science, electrical engineering, or a related field and 2-4 years of experience as a software developer in the fields of data communications or data networking.

2

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

claim." *Id.* at 1323.  Even "when the specification uses a single embodiment to enable the claims, courts should not limit the broader claim language to that embodiment 'unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest [exclusion] or restriction.'"   *Trading Techs. v.Espeed*, 595 F.3d 1340, 1352 (Fed. Cir. 2010) (citations omitted; emphasis added).

## III.    DISPUTED CLAIM CONSTRUCTIONS

The parties have agreed on the construction of certain terms.  *See* Joint Claim Construction and Prehearing Statement ("JCCS") (*AirWatch* Dkt. 69; *MobileIron* Dkt. 72) at 2.[3]  In addition, the parties have selected twelve terms/phrases for construction pursuant to Patent L.R. 4-3(c) and the Court's Order dated April 2, 2014.[4]  These phrases are listed in Exhibit 6 and are discussed below.

### A.     '606 Patent

The '606 Patent has been litigated, and the claims construed, in three prior cases in which Good (formerly known as "Visto") was a party:

- *Visto Corp. v. Good Tech.*, No. 2:06-cv-00039-TJW-CE (Dkt. No. 122) (E.D. Tex. Jan. 16, 2008) ("*Good*") (Ex. 7);

- *Visto Corp. v. Research in Motion Corp.*, No. 2:06-CV-181-TJW-CE (Dkt. No. 198) (E.D. Tex. Apr. 30, 2008) ("*RIM*") (Ex. 8);

- *Good Tech. Corp. v. Little Red Wagon Techs., Inc., et al.*, No. 3:11-cv-02373-M (Dkt. 226, 230) (N.D. Tex. Aug. 11, 2013) ("LRW") (Ex. 9, 10).

Despite the '606 Patent having been litigated several times, no court has ever construed the claims in the manner requested by Defendants, as is described in more detail below.

---

[3] For ease of reference, the parties' agreed claim constructions are listed on page 2 of Exhibit 11.

[4] Originally, there were fourteen terms at issue.  However, on June 12, 2014, Defendants advised Good that they had decided to drop the two "program code" claim terms.  Good does not oppose, and confirmed that the "program code" terms would not be addressed in the briefing.

1

### 1. "untrusted client site" ['606: 1, 10, 21, 25]

| Good's Proposal | Defendants' Proposal |
|---|---|
| "a computer that is outside the firewall and accessible to unprivileged users" | Indefinite (New position)<br><br>"computer that requires a user to enter remote-site identification and authentication information each time the computer logs onto the remote site" (Original position) |

The ordinary meaning of "untrusted client site" in the context of the '606 patent claims is "a computer that is outside the firewall and accessible to unprivileged users," as recognized in the prior cases noted above. *See* Ex. 7 (Good Claim Construction Order in *Good*) at 16 (construing "untrusted client site" to mean "a computer that is outside the firewall which is accessible to unprivileged users"); *see also* Ex. 8 (Claim Construction Order in *RIM*) at 12; Ex. 9 (Claim Construction Order in *LRW*) at 36.

Defendants originally took the position that "untrusted client site" could be construed, and offered a construction. *See* JCCS at 8. Less than two weeks before the due date for claim construction briefs, Defendants changed their position and for the first time advised Good that Defendants intended to argue that the term is allegedly indefinite. Defendants are incorrect. As demonstrated by the '606 patent and the prior court decisions in *Good*, *RIM*, and *LRW*, "untrusted client site" should be given the construction proposed by Good. The '606 Patent teaches that "client sites" outside of a firewall may be accessible to unprivileged users and hence are "untrusted." *See* '606 Pat. at 4:6-9 ("First, the base system 140 on the work client 110 site *negotiates a secure communications channel via any firewalls* with the synchronization agent 130, for example, using Secure Sockets Layer (SSL) technology" (emphases added)). In the field of computing, the term "untrusted" generally refers to a computer that is outside of the firewall—*e.g.*, a corporate firewall. *See* Ex. 12, Internetworkings Technology Handbook, 2nd ed. (1998) at 51-7 ("*Untrusted networks are outside the security perimeter and are external to the firewall server*.") (emphases added)).

The disclosure of U.S. Patent No. 6,085,192, which is incorporated by reference in the '606 Patent,[5] also supports the concept of a computer or mobile device outside the firewall using security

---

[5] *See, e.g.,* '606 Pat. at 1:19-24 (incorporating by reference U.S. Patent Application Ser. No.

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

1    measures to gain access to data behind a firewall as being "untrusted": "The communications

2    module 405 may further include routines for applying Secure Sockets Layer (SSL) technology and

3    user identification and authentication techniques (i.e., digital certificates) to establish a secure

4    communications channel *through the corporate firewall 130 and through the global firewall 126*."

5    Ex. 13 ('192 Patent) at 5:4-9 (emphases added).  Therefore, Good's proposed construction of this

6    term is consistent with both the intrinsic and extrinsic evidence, as well as the prior court opinions.

7         Defendants' originally proposed construction—a "computer that requires a user to enter

8    remote-site identification and authentication information each time the computer logs onto the

9    remote site"—departs significantly from the plain meaning (which defines the term by reference to a

10   firewall) and indicates that Defendants disagree with Good on the meaning of "untrusted."  See

11   JCCS at 8.  Defendants' proposed construction also does not comport with the full scope of the

12   intrinsic evidence.  For example, nowhere does the '606 patent specification state that a user must

13   enter "remote-site identification and authentication information each time the computer logs onto the

14   remote site."

15        While the '606 patent specification teaches in one embodiment that, when the user depresses

16   the "borrow me" button on the untrusted client site, the security module "requests the user to enter a

17   login and password" which is authenticated, the '606 patent specification also teaches that the

18   "security module" may include other "routines for obtaining user identification and authentication

19   using such techniques as … ***obtaining a public key certificate, etc.***" '606 Pat. at 8:52-56 (emphasis

20   added).  Identification and authentication by obtaining a public key certificate does not require "a

21   user to enter remote-side identification and authentication information each time the computer logs

22   onto the remote site."  Rather, a public key certificate is provided automatically without the need for

23   the user to manually enter the certificate each time the untrusted client site logs on to the remote site.

24   Likewise, through its use of the term "etc." the '606 patent specification expressly recognizes that

25   other identification and authentication techniques may be used according to the claimed inventions.

26   It is, of course, improper to import into the claims various limitations that may be found in examples

27   ─────────────────────────────────

28   08/835,997 which issued as U.S. Patent No. 6,085,192).

5

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

1  in the specification absent a clear intention to do so.  *Trading Techs.*, 595 F.3d at 1352; *see also*

2  *Ancora Tech. v. Apple Inc.*, 744 F.3d 732, 738 (Fed. Cir. 2014) (A claim's ordinary meaning "is not

3  properly overcome (and a relevant reader would not reasonably think it overcome) by a few passing

4  references that do not amount to a redefinition or disclaimer.").

5      Accordingly, the narrow construction originally proposed by Defendants, which fails to

6  capture the ordinary meaning of "untrusted" in the context of the '606 Patent's specification, must

7  be rejected.  Similarly, Defendants' new position of indefiniteness must also be rejected because the

8  claims and specification inform one skilled in the art of the claim scope with reasonable certainty.[6]

9        **2.  "temporary storage" ['606: 1, 10, 21, 25]**

| Good's Proposal | Defendants' Proposal |
|---|---|
| Plain meaning / no construction needed<br><br>In the alternative, should construction be deemed necessary: "non-permanent storage" | "storage location for data that is deleted each time the user closes the workspace data manager" |

13      The asserted claims of the '606 Patent recite downloading data to a smart phone or other

14  remote device, and storing that data in "temporary storage."  '606 Pat. at claims 1, 10, 21, 25.  The

15  claims also recite manipulating and "disabling" access to this downloaded data stored in "temporary

16  storage."  *Id.*  The words "temporary storage" are common and ordinary terms that do not need

17  separate construction.  *See, e.g., U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir.

18  1997) ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim

19  term in order to comply with the ruling that claim construction is for the court. . . . [Claim

20  construction] is not an obligatory exercise in redundancy.").

21      Should construction of "temporary storage" be deemed necessary, Good's proposal of "non-

22  permanent storage" hews closely to the plain meaning and should be adopted.  In addition, the '606

23  Patent teaches that the downloaded data in temporary storage can be modified or deleted, such that

24  the storage is properly understood to be "non-permanent."  *See, e.g.*, '606 Pat. at 7:11-16, 9:19-27.

27  [6] Good will respond further to Defendants' assertions regarding indefiniteness in its opposition to Defendants' motion for summary judgment, per the Court's Scheduling Order.

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

1   The Defendants' proposed construction departs from the plain meaning and incorrectly

2   imports limitations that are supported by neither the plain and ordinary meaning of "temporary

3   storage" nor the intrinsic record.  The Defendants' requirement that the data be "deleted each time

4   the user closes the workspace data manager" is unduly limiting and unsupported.  As alleged support

5   for their construction, the Defendants cite to the '606 Patent specification at 3:6-9; 8:61-9:3; 9:17-

6   10:39; 11:6-20 and a March 9, 2000 Response to Office Action at 6-7 within the '606 File History.

7   JCCS at 7-8.  None of these citations mentions "clos[ing] the workspace data manager," much less

8   deleting data each time the workspace data manager is closed.  In fact, the '606 Patent specification

9   never mentions closing a workspace data manager.  Instead, Defendants' cited support discloses

10   deletion of workspace data by a "de-instantiator" when an "end session" or "unborrow me"

11   command is received.  *See*, *e.g.*, '606 Pat. at 11:7-20.  In one non-limiting embodiment, this occurs

12   when a user *logs out* of a PIM program, not when the program is *closed*.  *See*, *e.g.*, '606 Pat. at 9:64-

13   10:3, 10:34-39.

14   While it is conceivable that an implementation of the inventions in the '606 Patent could

15   trigger an "end session" or "unborrow me" command when the workspace data manager is closed,

16   nothing in the specification requires reading this scenario into the claims.  *Even if* Defendants'

17   proposed restriction were supported by the specification—which it is not—it would be incorrect for

18   Defendants to read such a restriction into the claims.  *Phillips*, 415 F.3d at 1323 (noting that a court

19   should "avoid the danger of reading limitations from the specification into the claim").

20   The Defendants' construction is further unduly limiting in that it requires data to be

21   "deleted."  The asserted claims recite "disabling" access to data stored in temporary storage at an

22   untrusted client site, which would include alternatives to the deletion of data.  Defendants'

23   construction should be rejected for this additional reason in favor of the plain meaning.

24

25

26

27

28

7

**3. "synchronizing the manipulated data with the data at the remote site" / "synchronize the data" / "synchronizing the manipulated workspace data with the generated workspace data of the second client site via the remote site" ['606: 1, 10, 21, 25]**

| Good's Proposal | Defendants' Proposal |
|---|---|
| Plain meaning / no construction needed<br><br>In the alternative, should construction be deemed necessary: "reconcile[ing] data at the remote site with the manipulated workspace data" | "modifying existing data on the remote site to match the manipulated workspace data" / "modify existing data on the remote site to match the manipulated data" / "modify existing data on the remote site to match the manipulated workspace data and modifying the generated workspace data at the second client site to match the data on the remote site" |

Construction of the above phrases (collectively the "Synchronization Terms") is unwarranted as data synchronization is well-understood, and the '606 Patent does not import any special meaning into this common concept. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope.").

Should the Court deem construction of the Synchronization Terms necessary, Good's alternate construction—"reconcile[ing] data at the remote site with the manipulated workspace data"—should be adopted. This construction comports with prior cases such as *Visto v. Research in Motion*, where the court construed "synchronize" as "to provide for data consistency by reconciling modifications to stored information." Ex. 8 at 17-18. This prior construction was also agreed to by the parties in *Good v. Little Red Wagon* and adopted by the court. Ex. 9 at 1-2. Good's alternate construction of the Synchronization Terms follows from these prior court constructions, which embody the *reconciliation* of data between data sources, and promotes the crucial values of *stare decisis* noted by the Supreme Court in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996) ("[W]e see the importance of uniformity in the treatment of a given patent as an independent reason to allocate all issues of construction to the court."). At the very least, claim construction orders from prior courts are "accord[ed] deference . . . as persuasive authority." *Acer, Inc. v. Tech. Props., Ltd.*, 2009 U.S. Dist. LEXIS 8001, *7 (N.D. Cal. Feb. 4, 2009); *see also Verizon Cal. Inc. v. Ronald A. Katz Tech. Licensing, L.P.*, 326 F. Supp. 2d 1060, 1069 (C.D. Cal. 2003).

McKool Smith Hennigan, P.C.<br>255 Shoreline Drive, Suite 510<br>Redwood Shores, CA 94065

GOOD'S OPENING CLAIM CONSTRUCTION BRIEF

The Defendants' construction, on the other hand, improperly requires the "modif[ication] of existing data." While synchronization may be implemented by *modifying* a preexisting data record to reflect only changes made to a corresponding data record, synchronization systems may also be implemented by *completely replacing* the changed data record. The '606 Patent does not favor a particular implementation of synchronization, and the Defendants' attempt to read a modification requirement into the asserted claims is improper.

Similarly, the Defendants' proposed constructions attempt to read in a "match[ing]" requirement that is not supported by the specification. There is no requirement in the '606 Patent that the data on an untrusted client exactly match the data at the remote site. Indeed, the '606 Patent teaches that in one embodiment, data from the remote site may be modified or changed into a format acceptable to the untrusted client site during synchronization. '606 Patent at 2:35-37 ("A data reader translates the downloaded workspace data from the format used by the remote site to the format used by the workspace data manager."). When translation occurs according to this embodiment, data at the remote site would not necessarily match corresponding data at the untrusted client site.

Because the Defendants' construction attempts to read in limitations not found within the intrinsic record, their construction is incorrect and should not be adopted. The Synchronization Terms should be accorded their plain meaning.

**B.    '219 Patent**

**1.    "a data tracker configured to track a location of data items held on the client device, the data tracker tracking a correspondence of the data items to the first set or the second set" ['219: 18]**

| Good's Proposal | Defendants' Proposal |
|---|---|
| Plain meaning / no construction needed. Not subject to § 112, ¶ 6.<br><br>In the alternative, should construction be deemed necessary: "a software and/or hardware component configured to track the location of data items stored on the client device and track a correspondence of the data items to at least one of the first set and the second set" | Governed by 35 U.S.C. § 112(f).<br><br>Function: tracking a location of data items held on the client device and tracking a correspondence of the data items to the first set or the second set<br><br>Corresponding structure: None disclosed. Indefinite. |

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

9

A "data tracker" constitutes sufficient structure such that the phrase "a data tracker configured to track a location of data items held on the client device, the data tracker tracking a correspondence of the data items to the first set or the second set" is not subject to § 112, ¶ 6. When, as here, a claim phrase does not include the word "means," there is a strong presumption that § 112, ¶ 6 does not apply. *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004). Where the claim term connotes sufficient structure, the presumption cannot be rebutted. *Inventio Ag v. Thyssenkrupp Elevator Americas*, 649 F.3d 1350, 1357 (Fed. Cir. 2011) (noting that the "issue often reduces to" whether "a claim limitation is so devoid of structure that the drafter constructively engaged in means-plus-function claiming").

As shown in the '219 Patent's specification, the "data tracker" is an actual component of the "auto destruct client," and not merely a function. '219 Pat. at 3:26-28 ("[T]he auto destruct client may further comprise a data tracker for keeping track of data transfers and remembering the final location where data is stored."). The data tracker "keeps track of the transfers of data and remembers the final location where the data is stored in the storage 208, the working memory 209, the computer readable storage medium 206, or elsewhere." '219 Pat. at 14:54-57. Because "data tracker" is a component that connotes structure, the claim term is definite and not subject to § 112, ¶ 6. Further, it is immaterial that the name "data tracker" is descriptive of its function, as "[m]any devices take their names from the functions they perform." *Greenberg v. Ethicon Endo-Surgery*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("The examples are innumerable, such as 'filter,' 'brake,' 'clamp,' 'screwdriver,' or 'lock.'").

Should the court deem construction of the term necessary, Good's alternate construction should be adopted: "a software and/or hardware component configured to track the location of data items stored on the client device and track a correspondence of the data items to at least one of the first set and the second set." Good's construction merely provides the clarification that the data tracker can be hardware, software, or both.

Even if the Court determines that the data tracker term is subject to § 112, ¶ 6, the Defendants' contention that the Data Tracker Term has no corresponding structure, and is thus

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

indefinite, should be rejected, as will be further addressed in Good's opposition to the Defendants' indefiniteness summary judgment motion.

### 2. "list identifying each data item as belonging to one of the first set and the second set" ['219: 1, 9, 10]

| Good's Proposal | Defendants' Proposal |
|---|---|
| Plain meaning / no construction needed<br><br>In the alternative, should construction be deemed necessary: "a series of recorded items that indicates whether each data item belongs to the first set or the second set" | "enumeration of the data items with an indication for each data item whether it belongs to the first set or the second set" |

The phrase "list identifying each data item as belonging to one of the first set and the second set" is self-defining; one of skill in the art would understand it without additional construction. Each of the terms in the phrase is an ordinary term with which a jury would be familiar. Should the Court deem construction necessary, Good's alternate construction defines the claimed "list" as an easily understood "series of recorded items," a definition that comports with the typical understanding of "list." *See*, *e.g.*, Ex. 14 (Merriam-Webster's Collegiate Dictionary, 2002) at 678 ("a *simple series* of words or numerals" (emphasis added)).

The Defendants' construction is unduly restrictive and vague in multiple respects. For example, the Defendants' construction requires an "enumeration of the data items with an indication for each data item." This is contrary to the claim language which merely requires that the "list" identify whether each data item "belong[s] to one of the first and the second set." When a group of items is sorted into two sets—such as managed data and unmanaged data—a list that includes all items of the first set necessarily specifies that remaining items are within the second set. For example, a student can determine whether he made the "honor roll" by checking to see if his name is on the list—the student does not need a separate "not honor roll" list to determine which category of student he falls into. It is the same with the list of the '606 Patent.

Defendants' construction is also defective because it equates a simple "list" with a vague "enumeration of data items." The purpose of claim construction is to clarify the scope of the asserted claims, not to introduce further complexity and vagueness as Defendants' construction does. *See United States Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.").  Defendants cannot point to any "words or expressions of manifest exclusion or restriction" that would permit them to read either of their proposed restrictions into the claim language. *Trading Techs.*, 595 F.3d at 1352.  The "list identifying…" phrase accordingly requires no construction; however, should construction be deemed necessary, the Court should adopt Good's alternate proposal that does not introduce undue complexity and vague, unsupported restrictions.

### C.  '386 Patent

#### 1.  "set of rules" ['386: 1, 16, 17]

| Good's Proposal | Defendants' Proposal |
|---|---|
| Plain meaning / no construction needed<br><br>In the alternative, should construction be deemed necessary: "set of policies in a format interpretable by the rules engine" | "rule": "condition and an action to be taken if that condition is met" |

The claim phrase "set of rules" needs no construction because it is readily understood in the context of the '386 patent and the '386 patent does not assign the phrase a special meaning.  *See, e.g., U.S. Surgical*, 103 F.3d at 1568 ("[Claim construction] is not an obligatory exercise in redundancy.").  If construction is needed, it should be construed consistent with its plain meaning in the context of the claims and specification as a "set of policies in a format interpretable by the rules engine."  In particular, asserted claims 1 and 16 both specify that the set of rules is executed by the rules engine.  *See* '386 Pat. at claim 1 ("a rules engine communicatively coupled to the service to execute a set of rules . . ."), claim 16 ("executing, by the rules engine, the set of rules . . ."); *see also id.* at 4:25-30 ("***The rule definition file embodies a set of rules*** to be applied to the wireless device. … ***The rules engine 214*** of the wireless device 210 stores and ***executes the rule definition file***." (emphasis added)).  Likewise, the patent specification teaches that policies are transformed into the set of rules for the rule definition file.  *See* '386 Pat. at 5:22-24 (describing "corporate policies" such as "allowing or not allowing certain applications," "maintaining particular settings," "preventing certain peripherals from being associated with the wireless device," etc. as being transformed into a "set of rules").

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

1    Defendants, by proposing a definition for the word "rule" in the singular, incorrectly seek to

2    require that each rule in the "set of rules" includes a "condition and an action to be taken if that

3    condition is met."   The word "rule" in the singular is not in the asserted claims; the actual claim

4    phrase is "set of rules."   '386 Pat. at claims 1, 16.   Moreover, nowhere does the intrinsic record

5    require that each "rule" be in any particular format or always include one condition <u>and</u> one action.

6    Rather, the claims specify that the "rules engine" executes the "***set of rules***" "so as to gather

7    information … and take action based on the gathered information and the ***set of rules***."   *See* '386

8    Pat. at claim 1 (emphasis added).   Likewise, the specification teaches a "rules definition file"

9    including a "set of rules" executed by the rules engine.   *See* '386 Pat. at 5:22-24 (describing

10   "corporate policies" being transformed into a "set of rules" for the "rule definition file"); *see also*

11   '386 Pat. at 5:49-51, 5:61-63 ("Upon execution of the [rules definition] file, the rules engine 214

12   may gather information related to the wireless device" and "the rules engine 214 performs an action

13   based on the execution of the rules definition file.").   While the specification teaches for certain

14   embodiments that the "set of rules" guides or instructs the rules engine to gather information and

15   take action, there is no requirement—even for those embodiments—that each rule in the set of rules

16   includes a condition and action as Defendants would require.

17   Accordingly, to the extent that the term "set of rules" requires construction, the Court should

18   adopt the construction provided by Good.

19   ### 2.   "rules engine" ['386: 1, 16]

| Good's Proposal | Defendants' Proposal |
|---|---|
| "component(s) on a wireless device that executes rules" | "component on the wireless device that, without further communication with a server, evaluates the condition(s) specified in one or more rules received from the server and takes any action indicated by the rule" |

24   The parties generally agree that the "rules engine" is a component on the wireless device that

25   executes a set of rules.   However, to the extent that the Defendants suggest by their proposed

26   construction that each "rule" executed must be in a particular format, this is incorrect for the reasons

27   discussed above with respect to "set of rules."   Also incorrect is Defendants' proposal that it is

28

Case No. CV-12-05827 (EJD)                                           GOOD'S OPENING CLAIM CONSTRUCTION BRIEF

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

1   impermissible for the "rules engine" to communicate with a server during the execution/evaluation

2   of the set of rules—no such negative limitation should be imposed on the "rules engine."

3        Defendants appear to premise their proposed negative limitation on the prosecution history.

4   However, no statements in the prosecution history prohibit communication between the rules engine

5   and a server during execution of the set of rules.   During prosecution the applicant merely

6   distinguished the asserted prior art on the basis, *inter alia*, that it did not include a "rules engine on

7   the wireless device" or did not have a rules engine "that gathers information related to the wireless

8   device and takes action on the wireless device based on the gathered information"—the applicant

9   never stated that the rules engine is prohibited from communication with a server. *See, e.g*, Ex. 15

10  (2009-08-18 Office Action Response) at 8; Ex. 16 (2009-02-20 Office Action Response) at 7; Ex. 17

11  (2009-05-07 Office Action Response) at 7-8.   As such there is no "clear and unmistakable

12  disclaimer" here warranting imposition of Defendants' negative limitation. *See SanDisk Corp. v.*

13  *Memorex Prods., Inc.*, 415 F.3d 1278, 1286-1287 (Fed. Cir. 2005) (Prosecution disclaimer occurs

14  "[w]hen the patentee makes clear and unmistakable prosecution arguments limiting the meaning of a

15  claim term in order to overcome a rejection," but not when "a prosecution argument is subject to

16  more than one reasonable interpretation."); *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d

17  1314, 1324-1325 (Fed. Cir. 2003).

18       Defendants' negative limitation prohibiting communication with a server also conflicts with

19  the specification.   The specification describes that one problem of the prior art overcome by the

20  invention of the '386 patent is support for the "remote monitoring and maintenance of a wireless

21  device," which would involve communication with a server.   '386 Pat. at 1:48-50.   Likewise, the

22  specification teaches that several of the exemplary actions that can be taken by the rules engine

23  based on the monitoring of the wireless device expressly involve communications with a server—

24  *i.e.*, "initiating software downloads and upgrades, [and] alerting the corporate network monitors."

25  '386 Pat. at 4:51-58, 5:61-67.   Defendants' construction, which prohibits communication with a

26  server, would exclude these exemplary embodiments and is therefore incorrect. *ArcelorMittal Fr. v.*

27  *AK Steel Corp.*, 700 F.3d 1314, 1321 (Fed. Cir. 2012) (Courts "normally do not interpret claim

28  terms in a way that excludes disclosed examples in the specification.").

14

1   Defendants' construction, which incorrectly seeks to impose a negative limitation, should be

2   rejected, and Good's construction—that a "rules engine" is "component(s) on a wireless device that

3   executes rules"—should be adopted.

4       **3. "the service" ['386: 16]**

5

| Good's Proposal | Defendants' Proposal |
|---|---|
| "a service": "an application that maintains data objects on behalf of a user of a wireless device" | Indefinite |

8   The term "the service" appears in both claims 1 and 16 of the '386 patent.  Defendants

9   contend that the term "the service" in claim 16 (but not claim 1) is indefinite.  In particular,

10  Defendants apparently contend that there is no "antecedent basis" for the term "the service" in claim

11  16 and it is therefore indefinite in claim 16.  Whether there is an antecedent basis is irrelevant

12  because the scope of claim 16 is ascertainable by persons skilled in the art.  *Sealant Sys. Int'l, Inc. v.*

13  *Tek Global S.R.L.*, 2012 U.S. Dist. LEXIS 123313, *17-20 (N.D. Cal. Aug. 29, 2012) (finding terms

14  without antecedent basis not indefinite where one of skill in the art would understand the scope of

15  the claim from the content of the claims and specification).  In particular, it is clear that the term

16  "the service" in claim 16 refers to the service on a wireless device which is described in the patent

17  specification as an "application … to maintain data objects on behalf of a user of the wireless

18  device."  '386 Pat. at 4:14-16.  That claim 16 is referring to this "service" on the wireless device is

19  also evident from the context in claim 16 which specifies a number of operations performed by a

20  "rules engine" operating on a wireless device, including "maintaining particular settings associated

21  with the service." '386 Pat. at claim 16.

22  This understanding of the meaning of "the service" in claim 16 is also confirmed by the use

23  of the same term in claim 1—*i.e.*, "***a service*** to maintain data objects …" and "maintaining

24  particular settings associated with ***the service***."  '386 Pat. at 7:23, 33-34 (emphases added).

25  Defendants do ***not*** contend that the term "the service" is indefinite in claim 1, apparently because

26  the claim starts with "a service" rather than "the service."  But it is also apparent in claim 16 that

27  "the service" in claim 16 refers to an application on a wireless device that maintains data objects and

28  hence is not indefinite in claim 16.  This is especially true given the explicit description of "the

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

15

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

service" in the specification.  '386 Pat. at 4:14-16 (describing "the service" as an "application … to maintain data objects on behalf of a user of the wireless device.").  Defendants cannot meet their heavy burden of proving by clear and convincing evidence that the term "the service" in claim 16 fails to inform one skilled in the art of the claim scope with reasonable certainty.[7]  *Nautilus, Inc. v. Biosig Instruments, Inc.,* 134 S. Ct. 2120, 2014 U.S. LEXIS 3818, *6 (2014); *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.,* 743 F.3d 1359, 1366 (Fed. Cir. 2014) (defendant must prove indefiniteness by clear and convincing evidence).

Furthermore, in light of the fact that claim 16 first recites "the service" rather than first reciting "a service," as is the accepted practice when introducing a claim term, Good requests that the Court judicially correct "the" to "a" in the term "the service."  It is well-settled that, in a patent infringement suit, a district court may correct an obvious error in a patent claim where "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *CBT Flint Partners, LLC v. Return Path, Inc.,* 654 F. 3d 1353, 1358 (Fed. Cir. 2011); *see also Ultimax Cement Manufacturing Corp. v. CTS Cement Manufacturing Corp.,* 587 F.3d 1339, 1353 (Fed. Cir. 2009).  Here the correction is obvious—"the" should be changed to "a"—and the '386 file history does not suggest a different interpretation. As such, judicial correction of "the service" to "a service" is appropriate, and Good's construction which comports with the plain meaning in the context of the patent should be adopted.

---

[7] Good will respond further to Defendants' assertions regarding indefiniteness in its opposition to Defendants' motion for summary judgment, per the Court's Scheduling Order.

16

**D.    '322 Patent**

**1.   "rules uniquely identifying the updates for the wireless device" ['322: 1, 12]**

| Good's Proposal | Defendants' Proposal |
|---|---|
| Plain meaning / no construction needed<br><br>In the alternative, should construction be deemed necessary: "rules used to identify updates available for a particular wireless device" | "a set of conditions sufficient to identify which update packages are relevant to the wireless device" |

The claim phrase "rules uniquely identifying the updates for the wireless device" contains common terms that jurors would readily understand, regardless of whether one looks at the terms individually or in combination with one another.  It would not help the jury to rewrite these claim terms merely for the sake of choosing different words.  *See, e.g., U.S. Surgical*, 103 F.3d at 1568 ("[Claim construction] is not an obligatory exercise in redundancy.").

Defendants seek to replace the claim term "updates" with the phrase "update packages."  It would be incorrect to rewrite the claim language in this manner, as the specification contains no words of manifest exclusion limiting "updates" to "update packages."  *See Trading Techs.*, 595 F.3d at 1352.  The specification, in fact, shows that Defendants' proposed construction is incorrect.  The specification explains that the customer site receives a message indicating that "there are updates and/or applications available" for download, and an IT administrator assigns software policies to users and/or a group of users, such as by device.  *Id.* at 3:16-21.  The specification then provides support for the "rules uniquely identifying" claim phrase where it further states that "[i]n one embodiment, a software policy defines a rule, which uniquely identifies the updates and/or applications."  '322 Pat. at 3:21-23.

Defendants admit that the above portion of the patent specification supports "rules uniquely identifying the updates" because they identify it as intrinsic support.  *See* JCCS at 10 (identifying 3:21-23 of the patent for intrinsic support).  The specification accordingly supports this claim phrase with references to "updates," and there is no requirement that the updates be in "update packages."

The specification goes on to <u>later</u> describe <u>one embodiment</u> where the updates are in a package format, or update packages, for multi-language applications:

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

In another embodiment of the present invention a mechanism to distribute multi-language applications and updates in a package format is disclosed. FIG. 3 illustrates one embodiment of an update package 300. Update package 300 includes a similar software update provided in five different languages (i.e. English, German, French, Italian and Spanish).

'322 Pat. at 3:39-44.  The above passage is the first time that the patent specification introduces the concept of a package format or update package.  As such, the introduction of the update package embodiment occurs approximately 20 lines below where the claim phrase at issue is supported in the specification <u>without</u> reference to any update package embodiment.  The specification therefore shows that the claim phrase at issue is not restricted to an update package embodiment.  Instead, the update package format is simply one embodiment, and it should not be read into the claims.  At a minimum, the specification does not include any language suggesting that the update package embodiment is required.[8]

For these reasons, the patent specification supports the plain meaning construction by Good, and teaches against Defendants' attempt to import an unnecessary limitation from the specification.

**2. "message indicating one or more files within the updates to [download/upload]" ['322: 1, 7, 12]**

| Good's Proposal | Defendants' Proposal |
|---|---|
| Plain meaning / no construction needed<br><br>In the alternative, should construction be deemed necessary: "message indicating at least one file within the updates to [download/upload]" | "message identifying specific file[s] within an update package that are appropriate for the particular device to [download/upload]" |

The full claim phrase at issue here is "the wireless device receiving a message from the web-based software server indicating one or more files within the updates to download."  '322 Pat. at claim 1.  As with the prior claim phrase, the phrase does not need construction because it includes common language that would be familiar to a jury.  *U.S. Surgical Corp.*, 103 F.3d at 1568.  The

---

[8] There is also no reason to replace the simple term "rules" with "set of conditions sufficient to identify" as proposed by Defendants.  The phrase that Defendants seek to add does not add any clarification, but instead adds unnecessary complexity.  Moreover, there is no basis for Defendants to rewrite the claims in that manner.

issue for this "message . . . indicating" claim phrase is substantially similar to the issue covered above in the immediately preceding subsection, because Defendants once again seek to change the claim term "updates" to "update packages." Defendants' request is again incorrect.

First, the claim refers on an antecedent basis to "the updates" specified earlier in the claim, such as the "updates" referenced in the claim phrase "rules uniquely identifying the updates for the wireless device" discussed above. The updates are not restricted to an update package embodiment for the reasons described above, and the later usage of "updates" in the "message . . . indicating" claim term should have the same meaning. *See Omega Eng'g*, 334 F.3d at 1334 ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.").

Second, the patent specification again compels the conclusion that the claim term "update" should not be redefined as an "update package." The specification first provides support for an embodiment of a "wireless device receiving a message from the web-based software server indicating one or more files within the updates to download" at column 3, lines 26-34, where it states:

> At process block 240, device 130 accesses web-based software server 172 to receive information regarding the updates and/or applications. At process block 250, web-based software server 172 transmits a universal resource locator (URL) to device 130 that indicates the location of the updates and/or applications. At process block 260, device 130 downloads the updates and/or applications from web-based software server 172 via the received URL.

The specification accordingly provides support for this claim phrase with reference to "updates." And, as noted in the immediately preceding subsection, this description occurs before the specification ever introduces an "update package," or "package format" for the updates. *See* '322 Pat. at 3:39-41 ("In another embodiment of the present invention a mechanism to distribute multi-language applications and updates in a package format is disclosed."). Once again, the package format is simply one embodiment, and it cannot be read to restrict the "message . . . indicating" claim term.

Defendants also point to column 4, lines 28-39 as support for their construction. That description, however, is provided with respect to Figure 4, which is stated to correspond to one particular embodiment. *See* '322 at 4:8-9 ("Figure 4 illustrates one embodiment of a device 130

19

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

1  receiving an update from update package 300").   The specification goes on to describe an

2  embodiment utilizing an update package format.   '322 at 4:28-35.   Accordingly, the specification

3  provides a description of "message . . . indicating" in the context of updates in a package format as

4  well as updates not in the package format.   See '322 Pat. at 3:26-34.   This indicates that the

5  "updates" may or may not be in a package format, but that the claim is not restricted to a package

6  format.   There is nothing in the specification that clearly redefines or restricts "updates" to "update

7  packages."   *See Phillips,* 415 F.3d at 1316.

8

9  **3.  "searching a compatibility matrix [to identify/for] rules associated with each update" ['322: 1, 7, 12]**

10

| Good's Proposal | Defendants' Proposal |
|---|---|
| "for each update, searching rules that indicate whether an update is compatible with a particular wireless device" | "searching rules included in the update package to identify the rules associated with each update in that package" |

13  As with the preceding claim phrases, Defendants again seek to change "update" to "update

14  package."  Defendants' argument is again unavailing.

15  First, this claim phrase recites the identification of rules "associated with each update," again

16  referring in an antecedent manner back to the "update(s)" that were introduced earlier in the claim,

17  such as in the "rules uniquely identifying the updates for the wireless device" claim phrase discussed

18  above.   For the reasons explained above, the claim term "update" means exactly what it says—

19  "update"—and it is not limited to the update package embodiment.   Further, it is presumed that

20  claim terms are used consistently throughout a patent claim, so the "update[s]" references later in

21  the claim term are the same "update(s)" referenced earlier in the claim.   *See Omega Eng'g,* 334 F.3d

22  at 1334.   The claim term should not be construed two different ways within the same claim.

23  Accordingly, Good's proffered construction is the proper one.

24  Second, the specification does not support redefinition of "update(s)" to "update package(s)"

25  for this claim term.   The portion of the specification discussing the compatibility matrix describes an

26  embodiment where the web-based software server receives device specific information from a

27  wireless device, and then uses that device specific information to determine whether the update

28  associated with the device specific information is included in its compatibility matrix.   '322 Pat. at

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

20

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

4:17-22.  As such, the compatibility matrix has rules indicating whether an update is compatible with a wireless device.

The example provided in the specification, which is introduced with the limiting phrase "[i]n one embodiment," describes an exemplary compatibility matrix that determines which language version of an update is compatible with a particular wireless device, where the multi-language applications are in a "package format."  *See* '322 at 3:53-4:7 (describing exemplary compatibility matrix used with the multi-language applications in package format); *id.* at 3:39-41 ("In another embodiment of the present invention a mechanism to distribute multi-language applications and updates in a package format is disclosed").  For example, if the wireless device indicates a language of German, the German version of the update can be identified as the appropriate update for the wireless device.  *See id.* at 3:60-4:7.  But there are no expressions of manifest exclusion in the specification requiring the updates to be packaged together, such as in the language-specific package described in an embodiment in the specification.  *See Trading Techs.,* 595 F.3d at 1352.

Setting aside the improper "update package" limitation, the parties are close with their proposed constructions.[9]  Defendants' proposal, however, ignores the word "compatibility" or "compatible" altogether and therefore does not reflect the fact that the rules indicate whether an update is compatible with a particular wireless device.  Good's proposed construction therefore is the proper one.

### 4.  "web-based software server" ['322: 1, 2, 7, 12, 13, 16]

| Good's Proposal | Defendants' Proposal |
|---|---|
| Plain meaning / no construction needed<br><br>In the alternative, should construction be deemed necessary: "a software server accessible via the World Wide Web" | "server outside the customer site accessed via the web from which software is downloaded" |

---

[9] Defendants compound their "update package" error not only by writing the limitation into the claims, but also by incorrectly requiring the rules to be "included in the update package."  The claim language does not so require, and there are no words of manifest exclusion requiring the rules to be included in an update package.

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065

1     This phrase does not need construction because it uses plain and ordinary words.  If it is

2     construed, it could be clarified that web-based means that the server is accessed via the web, a point

3     upon which all parties agree.  The parties' dispute arises because Defendants attempt to change the

4     claim language to require an unnecessary limitation on the location of the web-based software

5     server, such that the web-based software server must be "outside the customer site."  This is a

6     classic example of an improper attempt to write a limitation into the claims from the specification.

7     *See Phillips*, 415 F.3d at 1323 (courts must "avoid the danger of reading limitations from the

8     specification into the claim").

9     The patent claims recite certain limitations regarding the web-based software server:  the

10    software server must be accessible via the web; the wireless device must transmit device specific

11    information to the web-based software server; the web-based software server must search a

12    compatibility matrix to identify rules associated with each update; and the wireless device must

13    receive a message from the web-based software server indicating one or more files within the

14    updates to download.  *See, e.g.*, '322 Pat. at claim 1.  Notably, the claim language itself already

15    provides limitation on the location of the web-based software server because the recited server must

16    be web-based, or accessible via the web.  But there is no further locational limitation as to how the

17    web-based software server compares with the customer site.  The claims do not require the web-

18    based software server to be "outside the customer site," as Defendants would amend the claims.  In

19    other words, if the web-based software server is accessible via the web—and meets the other above-

20    recited limitations of the claims—the claims require nothing further regarding the server's location.

21    The patent specification also does not contain any disclaimer or words of manifest exclusion

22    that would require the web-based software server to be "outside the customer site."  Figure 1 shows

23    the web-based software server connected to a wireless server provider network, but the descriptive

24    text from the specification clarifies that this is just one embodiment.  '322 Pat. at 2:65-67

25    ("According to one embodiment, updates and/or applications for device 130 are transmitted to web-

26    based software server 172 from wireless service provider network . . .") (emphasis added).  None of

27    the passages cited by Defendants in the JCCS contain any express restriction or disclaimer requiring

28    the web-based software server to be "outside the customer site."

1   There is nothing in the specification or the claims compelling Defendants' proposal.  So long

2   as the recited software server is accessible via the web, the claims do not require anything more as to

3   its physical location.

**IV.     CONCLUSION**

4

5   Good's proposed constructions are fully supported by the intrinsic and extrinsic evidence.

6   For the reasons discussed, Good respectfully requests that the Courts adopt its proposed construction

7   for the disputed terms and phrases.

8

9   DATED:  June 23, 2014                     McKool Smith Hennigan, P.C.

10

11                                            By   /s/ Craig Tolliver
                                                   Craig Tolliver
12

13                                           Attorney for Plaintiffs
                                             Good Technology Corporation and
14                                           Good Technology Software, Inc.

15                                           Courtland L. Reichman, SBN 2668873
                                             MCKOOL SMITH HENNIGAN, P.C.
16                                           255 Shoreline Drive, Suite 510
                                             Redwood Shores, California 94065
17                                           Tel: (650) 394-1400; Fax: (650) 394-1422
                                             creichman@mckoolsmith.com
18
                                             Steven J. Pollinger (pro hac vice)
19                                           Craig N. Tolliver (pro hac vice)
                                             Geoffrey L. Smith (pro hac vice)
20                                           Eric C. Green (pro hac vice)
                                             MCKOOL SMITH, P.C.
21                                           300 West 6th Street, Suite 1700
                                             Austin, Texas 78701
22                                           Tel: (512) 692-8700; Fax: (512) 692-8744
                                             spollinger@mckoolsmith.com;
23                                           gsmith@mckoolsmith.com

24                                           Robert Muller, SBN 189651
                                             Douglas P. Roy, SBN 241607
25                                           CYPRESS, LLP
                                             11111 Santa Monica Blvd., Suite 500
26                                           Los Angeles, California 90025
                                             Tel: (424) 901-0123; Fax: (424) 750-5100
27                                           bob@cypressllp.com; doug@cypressllp.com

28

Case No. CV-12-05827 (EJD)                                    GOOD'S OPENING CLAIM CONSTRUCTION BRIEF

McKool Smith Hennigan, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065